E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 11-298-GHK (DTBx) | Date | January 28, 2013 |
|---|---|---|---|

| Title | *Jeannette Pedroza v. PetSmart, Inc. et al.* |
|---|---|

| Presiding: The Honorable | **GEORGE H. KING, CHIEF U.S. DISTRICT JUDGE** |
|---|---|

| Beatrice Herrera | N/A | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:** **(In Chambers) Order re:** (1) Plaintiff's Third Motion to Certify Class (Dkt. No. 103); (2) Defendant's Motion to Strike Non-Expert Declarations in Support of Plaintiff's Third Motion for Class Certification (Dkt. No. 113); (3) Defendant's Motion to Strike Declaration of David Friedland (Dkt. No. 114); (4) Plaintiff's Motion to Strike Non-Expert Declarations Submitted by Defendant (Dkt. No. 123)

This matter is before us on the Plaintiff Jeannette Pedroza's ("Plaintiff") Third Motion for Class Certification and the Parties' various Motions to Strike Declarations. We have considered the arguments in support of and in opposition to these Motions and consider these matters appropriate for resolution without oral argument.  L.R. 7-15.  As the Parties are familiar with the facts, we will repeat them only as necessary.  Accordingly, we rule as follows.

**I.      Background**

Plaintiff Jeannette Pedroza ("Plaintiff"), a former store manager of a PetSmart store in Apple Valley, California, filed this putative class action against Defendant PetSmart, Inc. ("Defendant"), a specialty retailer of products and services for pets.  Plaintiff asserts that Defendant uniformly misclassified Store Manages ("SMs") as exempt employees.[1]  Based on this principal allegation, the Complaint asserts the following claims: (1) preliminary and permanent injunction; (2) failure to provide required rest periods, Cal. Lab. Code § 226.7; (3) failure to provide required meal periods, Cal. Lab. Code §§ 226.7, 512, and 558; (4) failure to pay overtime compensation, Cal. Lab. Code §§ 510 and 1194; (5) failure to provide accurate statements and to maintain required records, Cal. Lab. Code §§ 226, 226.3, and 1174; (6) failure to pay minimum wage, Cal. Lab. Code §§ 1194, 1197, 1197.1, and IWC Wage Order 1-2001; (7) failure to pay wages upon termination, Cal. Labor Code §§ 21, 202, 203, and 227.3; (8) unlawful business practices, Cal. Bus. & Profs. Code §§ 17200, et seq.; (9) unlawful collection or receipt of wages previously paid and failure to indemnify for expenditures in discharge of

---

[1] As of January 29, 2012, Defendant has 125 stores in California.  (Mot. 2, Exh. C at 18).  The SM is the highest ranking employee working at each store and oversees hourly store associates who handle a variety of assignments.

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 11-298-GHK (DTBx) | Date | January 28, 2013 |
|---|---|---|---|
| Title | *Jeannette Pedroza v. PetSmart, Inc. et al.* | | |

duties, Cal. Lab. Code §§ 221 and 2802; (10) failure to pay premiums for split shifts; and (11) representative action for civil penalties, Cal. Lab. Code §§ 2698-2699.5.[2]  All of Plaintiff's claims appear to derive from her assertion that she and other SMs were misclassified as exempt, and that as a result of the misclassification, they were not paid overtime wages, not given rest or meal breaks, not given accurate pay statements, and so forth.

On August 13, 2012, Plaintiff filed her Third Motion to certify the following Class: "[a]ll persons who were employed by PetSmart, Inc. in California as a Store Manager at any time on or after November 29, 2006." (Mot. 15).  The Parties subsequently filed various untimely Motions to Strike Declarations.

**II.     Motions to Strike and Defendant's Evidentiary Objections**

**A.     Defendant's Evidentiary Objections**

Defendant asserts a total of 184 objections to Plaintiff's evidence.  Unlike evidence presented at a summary judgment stage, however, evidence presented in support of class certification need not be admissible at trial.  *See Keilholtz v. Lennox Hearth Prods. Inc.*, 268 F.R.D. 330, 337 n.3 (N.D. Cal. 2010); *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 599 (C.D. Cal. 2008).  Accordingly, we need not rule on Defendant's specific evidentiary objections.  However, to the extent that Defendant objects on grounds suitable for review at this stage, its objections are either moot because they do not go to evidence that formed the basis for this ruling, or are overruled.

**B.     The Parties' Motions to Strike**

After Plaintiff filed her Motion for Class Certification, the Parties filed the following untimely Motions to Strike: (1) Defendant's Motion to Strike Plaintiff's Non-Expert Declarations; (2) Plaintiff's Motion to Strike Defendant's Non-Expert Declarations; and (3) Defendant's Motion to Strike Plaintiff's Expert Declaration.  Plaintiff also filed an objection to Defendant's Expert Declaration.[3]

First, both Parties seek to strike certain Non-Expert Declarations on the ground of untimely disclosure.  In particular, Defendant seeks to strike the declarations of Colleen Davis, Russell Follmer, and Pragmacio Tierno because their identities were not disclosed to Defendant until August 10, 2012, just one business day before Plaintiff filed her Motion for Class Certification.  Likewise, Plaintiff seeks to strike 18 non-expert declarations that support Defendant's Opposition to the Motion for Class Certification, on the ground that these declarants were not disclosed until February 6, 2012, when

---

[2] On June 14, 2012, we granted Defendant's Motion for Summary Judgment as to Plaintiff's claim for statutory penalties under Labor Code §§ 203 and 226(e).  (*See* Dkt. No. 94).

[3] Because we do not rely on Defendant's Expert Declaration, Plaintiff's objection is overruled as moot.

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 11-298-GHK (DTBx) | Date | January 28, 2013 |
|---|---|---|---|
| Title | *Jeannette Pedroza v. PetSmart, Inc. et al.* | | |

Defendant filed their Opposition to Plaintiff's Second Motion for Class Certification and just two weeks before the discovery completion date on February 20, 2012.  Having reviewed all of the declarations at issue, we find that they do not materially affect the outcome of this Order.  Accordingly, while we are troubled by the Parties' conduct and view it with disfavor, inasmuch as the Motions seek to strike certain Non-Expert Declarations on the ground of untimely disclosure, they are **DENIED**.  Moreover, because Defendant asserts that it filed 7 additional declarations solely to rebut the declarations of Davis, Follmer, and Tierno, and we are denying Defendant's motion to strike these three declarations, Plaintiff's motion to strike the 7 responsive declarations is likewise **DENIED**.

        Second, Defendant's Motion to Strike Non-Expert Declarations also seeks to strike the declarations of John Zullo, Judy Abeldt, La Donna Baca, Joseph Cerrillo, Kristeen Kowalow, and Roger Triffo, on the ground that they are false, lacking in credibility and personal knowledge, and misleading, given that these declarants have provided deposition testimony that contradicts their declarations.[4]  We find, however, that these inconsistencies go to the weight of the declarations, not their admissibility. Accordingly, inasmuch as Defendant's Motion seeks to strike certain Non-Expert Declarations on the ground of inconsistent or inaccurate statements, it is **DENIED**.

        Finally, Defendant moved to strike Plaintiff's Expert Declaration of David Friedland, on the grounds of untimely disclosure and that the opinions offered are unreliable.  Like the 3 additional declarants whose identities were not disclosed by Plaintiff until August 10, 2012 – just one business day before Plaintiff filed her Motion for Class Certification – Plaintiff revealed for the first time that she intended to file this expert declaration on August 10, 2012, nearly 6 months after the discovery completion date on February 20, 2012.  Moreover, despite the fact that Plaintiff had nearly 6 additional months to prepare this expert declaration, it contains no expert opinion based on any data.  Instead, the declaration merely promises that Friedland could develop a survey that would provide us with a "statistical sampling of the time the store managers spend in performing [various] job tasks so the court can determine whether fifty percent or more of the tasks being performed by store managers are exempt vs. non-exempt tasks."  (Friedland ¶ 5).  To prepare this survey, Friedland states that he "can use

---

        [4] Defendant points out, for instance, that Baca, Cerrillo, and Abeldt's declarations state that they groomed dogs (a non-managerial task) as SMs, but they acknowledged during their depositions that they had never groomed dogs.  (*See* Baca Dep. 102:4-20; Cerrillo Dep. 59:13-14; Abeldt Dep. 69:14-21).  In addition, even though Baca, Cerrillo, Triffo, Kowalow, and Abeldt's declarations state that they "opened the store each work day" as SMs, they acknowledged in their depositions that that was not the case.  (*See, e.g.*, Kowalow Dep.119:5-12 (acknowledging that the she opened the store usually only once per week)).  Moreover, even though the declarations uniformly stated that they "spent more than 50% of [their] time performing non-managerial tasks" during their times as SMs, their deposition testimony was not consistent with this statement.  (*See* Baca Dep. 218:13-220:5 (acknowledging that from the middle of 2008 and to when she left in November 2008, she spent more than half of her time performing managerial tasks); Cerrillo Dep. 166:16-167:2 (acknowledging that he spent "most of the time running [his] store" as Store Manager); Triffo Dep. 231:25-232:5 (acknowledging that between 2007 and 2009, the statement that he spent more than 50% of the time on non-managerial tasks is not accurate)).

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 11-298-GHK (DTBx) | Date | January 28, 2013 |
|----------|-------------------------|------|------------------|

| Title | *Jeannette Pedroza v. PetSmart, Inc. et al.* |
|-------|-----------------------------------------------|

information maintained by PetSmart concerning the job of Store Manager and other jobs performed by PetSmart employees" to evaluate the duties and tasks performed by SMs.  (*Id.* ¶ 6).  He further asserts that he can perform a "job analysis that identifies the relative percentage of time spent by store managers in performance of various tasks by accessing information concerning the frequency of performance and amount of time spent by store managers on these duties and tasks."  (*Id.* ¶ 7).  He further states that he will "select and utilize a representative sample of store managers to participate in the survey" to produce "reliable conclusions concerning the relative time spent on the various duties and tasks by store managers in California."  (*Id.* ¶ 8).  The declaration provides no specific information about what records Friedland plans to use to identify the relevant duties and tasks performed by SMs, why these records sufficiently reflect the universe of duties performed by SMs, what records can accurately reflect the number of hours the SMs spent on the duties, and how he plans to select a representative sample of SMs to participate in the survey.

Under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993), "the trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable."  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).  In *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551, 2553-54 (2011), the Supreme Court left open the question of whether district courts must conduct *Daubert* analysis at the class certification stage.  *See id.* ("The District Court concluded that *Daubert* did not apply to expert testimony at the certification stage of class-action proceedings.  We doubt that is so  . . . .").  In *Ellis*, the Ninth Circuit recognized that the district court correctly applied the *Daubert* standard to evaluate the admissibility of expert testimony at class certification, but that it erred by ending its inquiry there.  657 F.3d at 982.  *Ellis* instructs that to the extent the expert testimony concerns a Rule 23 requirement, we must go beyond mere admissibility and evaluate the testimony's persuasiveness under the relevant standard for evaluating that requirement – i.e. if the testimony concerns commonality, it must pass muster under the "rigorous analysis" standard *Dukes* requires in assessing commonality.  *Id.*  Inasmuch the "rigorous analysis" standard sets forth a higher standard than *Daubert*, it appears that under *Ellis*, we are required to engaged in *Daubert* analysis to the extent the testimony concerns a Rule 23 requirement.  If we find that the expert testimony is not admissible, the inquiry ends there; but if we find the testimony admissible, we must engage in further analysis of its persuasiveness under the relevant Rule 23 standard.

"The test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology."  *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).  Here, Friedland fails to provide any specific information about the methodology of his proposed survey, much less provide sufficient information for us to evaluate the methodology's soundness.  Indeed, Friedland does not explain what data he plans to use in developing the survey, why such data is sufficiently complete and reliable, how he plans to use such data to develop a survey, how he plans to select a representative sample of SMs to participate in the survey, why such a selection would be representative, and why the survey will reliably show how the SM allocated their time between exempt and nonexempt tasks.  Instead, Firedland merely "promises" that he will be able to complete a survey that can reliably show whether the SMs spent more than 50 percent of their time on nonexempt tasks, an issue that concerns

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 11-298-GHK (DTBx) | Date | January 28, 2013 |
|---|---|---|---|
| Title | *Jeannette Pedroza v. PetSmart, Inc. et al.* | | |

commonality, as discussed below.  We find and conclude that this type of unsupported, conclusory "promise" of reliable data is insufficient to pass muster under *Daubert*.

Accordingly, Defendant's motion to strike the expert declaration is **GRANTED**.

### III.     Motion for Class Certification.

#### A.       Legal Standard

A motion for class certification is governed by the requirements of Federal Rule of Civil Procedure 23.  While we may generally accept the allegations in the complaint as true in determining class certification, we must consider the merits of plaintiffs' claims to the extent they overlap with Rule 23 requirements, *Ellis*, 657 F.3d at 981, as "the class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *General Telephone Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978)).  "When considering class certification under Rule 23," we "must perform a rigorous analysis to ensure that the prerequisites of Rule 23(a) have been satisfied." *Ellis*, 657 F.3d at 980.

Here, Plaintiff seeks to certify a Rule 23(b)(3) Class.  Accordingly, Plaintiff bears the burden[5] of establishing that the following Rule 23(a) and Rule 23(b)(3) requirements are met:

(1) "the class is so numerous that joinder of all members is impracticable," Rule 23(a)(1);
(2) "there are questions of law or fact common to the class," Rule 23(a)(2);
(3) "the claims or defenses of the representative parties are typical of the claims or defenses of the class," Rule 23(a)(3);
(4) "the representative parties will fairly and adequately protect the interests of the class," Rule 23(a)(4);
(5) "the questions of law or fact common to class members predominate over any questions affecting only individual members," Rule 23(b)(3); and
(6) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," Rule 23(b)(3).

#### B.       Analysis

---

[5] This is the case even if the plaintiffs' "underlying claim ar[ises] under California law and employer b[ears the] burden of proving on merits that [the plaintiffs] were not misclassified as exempt under state law." *Marlo v. UPS*, 639 F.3d 942, 946 (9th Cir. 2011).

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 11-298-GHK (DTBx) | Date | January 28, 2013 |
|---|---|---|---|
| Title | *Jeannette Pedroza v. PetSmart, Inc. et al.* | | |

In this case, the central question is whether the SMs are misclassified under California law. Under California law, the executive exemption applies to any employee:

(a)     whose duties and responsibilities involve the management of the enterprise in which he/she is employed or of a customarily recognized department or subdivision thereof; and

(b)     Who customarily and regularly directs the work of two or more other employees therein; and

(c)     Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and

(d)     Who customarily and regularly exercises discretion and independent judgment; and

(e)     Who is primarily engaged in duties which meet the test of the exemption. The activities constituting exempt work and non-exempt work shall be construed in the same manner as such items are construed in the following regulations under the Fair Labor Standards Act effective as of the date of this order: 29 C.F.R. Sections 541.102, 541.104-111, and 541.115-116. Exempt work shall include, for example, all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions. The work actually performed by the employee during the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job, shall be considered in determining whether the employee satisfies this requirement.

(f)     Such an employee must also earn a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment. Full-time employment is defined in Labor Code Section 515(c) as 40 hours per week.

Cal. Code Regs. Tit. 8, § 11070.

Here, Plaintiff asserts that that SMs are misclassified as exempt because they do not "customarily and regularly exercise[] discretion and independent judgment" as required by subpart (d) and because they do not "primarily engage[] in duties which meet the test of exemption" under subpart (e). (Mot. 21). Thus, to obtain class certification, Plaintiff bears the burden of establishing commonality.

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 11-298-GHK (DTBx) | Date | January 28, 2013 |
|---|---|---|---|
| Title | *Jeannette Pedroza v. PetSmart, Inc. et al.* | | |

### 1.    Whether the SMs Were "Primarily Engaged" in Exempt Duties

#### a.    Commonality

Rule 23(a)(2) requires Plaintiff to show that "there are questions of law or fact common to the class." These common issue or issues must be *material* to the resolution of the claims asserted and demonstrate that putative Class Members "suffered the same injury." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1992). In *Dukes*, 131 S. Ct. at 2551, the Supreme Court explained that while a single common issue may suffice, it "must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Indeed, after *Dukes*, "what matters to class certification is not the raising of common questions – even in droves – but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.* at 2551 (internal quotation and alteration removed).

In *Dukes*, the plaintiffs failed to establish the existence of a common question because they "provide[d] no convincing proof of a companywide discriminatory pay and promotion policy." *Id.* Specifically, the Court found that where the plaintiffs alleged that every woman at Wal-Mart was "the victim of one common discriminatory practice," they failed to offer "significant proof" that Wal-Mart operated under a general policy of discrimination, given that plaintiffs' expert "conceded that he could not calculate whether 0.5 percent or 95 percent of the employment decisions at Wal-Mart might be determined by stereotyped thinking." *Id.* at 2548, 2554. Similarly, in *Ellis*, decided after *Dukes*, the Ninth Circuit required the district court to engage in a "rigorous analysis" to determine, on remand, "whether there was 'significant proof' that [the defendant] operated under a general policy of discrimination" that could "affect the class *as a whole*." *Ellis*, 657 F.3d at 983.

Thus, under the post-*Dukes* commonality inquiry, we must conduct a "rigorous analysis" to determine if Plaintiff has offered "significant proof" of a common policy or practice "that could affect the class *as a whole*." *Ellis*, 657 F.3d at 983. Under *Dukes*, it is the existence of this common policy or practice that drives the generation of common questions and answers. *See* 131 S. Ct. at 2551. Here, in alleging that SMs do not "primarily engage[] in duties which meet the test of exemption," Plaintiff essentially asserts that Defendant had a common policy or practice of requiring SMs to spend the majority of their time on nonexempt tasks. As discussed below, we find and conclude that Plaintiff fails to offer "significant proof" that there was such a common practice that could affect the class as a whole.

Under the "primarily engaged" requirement of executive exemption, we must "determine whether any given class member (or all the class members) spend more than 51% of their time on managerial tasks in any given workweek." *Dunbar v. Albertson's, Inc.*, 141 Cal. App. 4th 1422, 1426 (2006). In order words, "[t]he 'primarily engaged' prong of the exemption inquiry requires a week-by-week analysis of how each employee spent his or her time." *Cruz v. Dollar Tree Stores, Inc.*, 2011 WL 2682967, at *4 (N.D. Cal. July 8, 2011).

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 11-298-GHK (DTBx) | Date | January 28, 2013 |
|---|---|---|---|

| Title | *Jeannette Pedroza v. PetSmart, Inc. et al.* |
|---|---|

        In support of her allegation that Defendant had a policy or practice of requiring SMs to spend more than 50 percent of their time on nonexempt tasks, Plaintiff primarily relies on the declarations of 12 former SMs. The declarations state that the declarants spent "more than 50% of [their] time performing non-managerial tasks" as SMs. (*See, e.g.*, Baca Decl. ¶ 9; Cerrillo Decl. ¶ 7). Additionally, Plaintiff asserts that three "common proofs" can help to establish the existence of a common practice or policy. First, Plaintiff asserts that Defendant's uniform training program is common proof. She alleges that SMs are molded through a uniform, comprehensive "GetSmart" training program. (Mot. 4). "A 'GetSmart' store is a store that is chosen based on [the] expertise of [the] store manager to be able to validate knowledge of what was learned through [the electronic training] courses or modules." (Hamamoto Dep. 28:21-24). Plaintiff alleges that when she and the putative class members participated in the GetSmart training program, they observed the GetSmart SM perform non-managerial tasks normally assigned to hourly PetSmart Associates more than 50 percent of the time. (*See* Abelt Decl. ¶ 7; Baca Decl. ¶ 7).

        Second, Plaintiff asserts that Defendant's uniform scheduling system is common proof. Plaintiff alleges that SMs are responsible for using a computerized scheduling application called "PS2" to create advanced schedules. The program takes into consideration the number of hourly associates and scheduled absences for the following week and calculates a required minimum number of labor hours to schedule for the following week. Based on this information, the SMs create an associate work schedule so that all labor hours recommended by the program are worked by hourly associates. (Hamamoto Dep. 77:17-79:7). Plaintiff alleges that because of budget constraints and the District Manager's instruction to keep the labor budget low, there were not enough hourly associates to work all the labor hours that PS2 required. "As such, SMs had to schedule SMs . . . to work longer shifts than usual because PetSmart did not have enough hourly Associates available." (Mot. 12). Plaintiff asserts that "PS2 and its uniform scheduling system are a common method of proof for determining whether SMs were properly classified by PetSmart" because the schedules can reveal whether the SMs were doing the work of an hourly associate. (Mot. 13). Plaintiff also asserts that Defendant's "Store Services Staffing Reports" can also be used "to track when employees had to work additional hours because of understaffing." (*Id.*) "By comparing Store Services Staffing Reports to work schedules, one can ascertain if employees worked unanticipated hours by comparing PetSmart's estimate of the workweek (i.e., the work schedule, which is created in advance) to how long employees actually worked (i.e., the Report)." (*Id.*).

        Third, Plaintiff argues that Defendant's business records are common proof of the misclassification. In particular, Plaintiff asserts that records of SMs working as Manager-on-Duty ("MOD") or Customer Engagement Officer ("CEO") help to prove misclassification because nonexempt tasks like cleaning up dog feces/urine, throwing out trash, etc., were "often conducted when SMs were acting as [MOD or CEO]." Moreover, Plaintiff asserts that Defendant's sales and commission reports can be used to determine whether SMs are bathing dogs, a nonexempt task. Plaintiff further asserts that SMs are given unique codes to operate the cash register, which can be used to determine whether the SMs were operating the cash register, another nonexempt task. (Mot. 15). Finally, Plaintiff asserts that SMs are given unique alarm codes used for closing the stores, and the codes can be used to determine

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 11-298-GHK (DTBx) | Date | January 28, 2013 |
|----------|--------------------------|------|------------------|

| Title | *Jeannette Pedroza v. PetSmart, Inc. et al.* |
|-------|----------------------------------------------|

whether and how long SMs are working past their scheduled shifts by comparing the times when SMs activated the alarm to their work schedule.  (*Id.*).

We find most of Plaintiff's purported "common proof"– including Defendant's scheduling system, staffing reports, other business records, and MOD records – has limited value as "proof" of a common practice.  Viewing Plaintiff's theory in light most favorable to her, she asserts that the PS2 system is "common proof" because whenever there is a gap in associate labor hours, the SMs necessarily filled the gap because of budgetary constraints that purportedly discourage SMs from hiring new associates or requiring associates to work overtime.  Thus, Plaintiff asserts that the PS2 scheduling system can inform us how much time a SM spent performing the duties of an hourly associate.  First, even if we assume this is true, Plaintiff has not established how we can determine, on a class-wide basis, what tasks the SMs are otherwise performing and the amount of time spent on them.  Absent such data that account for the SMs' total work hours and tasks performed, the PS2 system alone cannot tell us whether the SMs spent more than 50 percent of their time on nonexempt tasks.  Second, the one Store Services Staffing Report submitted by Plaintiff tends to undermine her assertion that the associate gaps were necessarily filled by SMs because the Report shows that nearly half of the associates in that particular store had worked overtime on that week, which suggests that budgetary constraints did not preclude SMs from requiring associates to work overtime to fill in the gaps.  (*See* Mot., Ex. N). Moreover, Defendant's representative had expressly stated that to the extent SMs could fill in an associate gap, they do so only as "an exception."  (Mot., Ex. K, at 91:19-92:6).  Plaintiff offers no evidence that contradicts this assertion.[6]  If SMs did not, as a matter of course, fill in all associate gaps, the PS2 system likely accounts for a relatively small portion of the total hours worked by the SMs.  And again, absent data showing what tasks SMs are otherwise performing and the amount of time they spent on the tasks, the PS2 system cannot give us a common answer on whether the SMs spent more than 50 percent of their time on nonexempt tasks.

To the extent Plaintiff argues that the other records can establish what tasks the SMs are otherwise performing, her argument is unconvincing for two reasons.  First, inasmuch as certain records – such as the cashier register records or salon records – show when a SM was performing such nonexempt tasks, they provide only piecemeal information about how long a SM spent on a few of the many possible nonexempt tasks they might perform.  Second, other records like the MOD/CEO schedule or alarm code records reveal only the length of time worked by SMs, not the tasks they performed during those periods.  That a SM spent certain hours working as a MOD/CEO, for instance, does not establish that those hours were devoted to performing only nonexempt tasks, given that a SM also performs exempt tasks, such as ensuring that the store was running properly and responding to customer complaints, while functioning as a MOD/CEO.  (*See, e.g.*, Pedroza Dep. 143:7-144:3; 156:20-157:7); *see also Casida v. Sear Holdings Corp.*, 2012 WL 3260423, at *15 n. 7 (E.D. Cal. Aug. 8, 2012) (finding that assistant managers who spent 95% of their time on the sales floor does not mean, without

---

[6] To the extent Plaintiff relies on declarations from other putative Class Members, who state that they had to schedule themselves to fill in associate gaps, the declarations are not sufficiently representative or reliable, as discussed below.

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 11-298-GHK (DTBx) | Date | January 28, 2013 |
|---|---|---|---|

| Title | *Jeannette Pedroza v. PetSmart, Inc. et al.* |
|---|---|

more, that they were engaging in non-exempt tasks, given that they also managed "associates whose work occur[red] on the sales floor"). Thus, even when we view all the proffered records together, they do not offer a complete picture of how a SM allocates his or her time between exempt and nonexempt tasks on a weekly basis, much less do so on a classwide basis.[7]  Accordingly, we conclude that Plaintiff has failed to sufficiently show that these records have the ability to prove the existence of a common practice.

As to the declarations, their ability to give rise to an inference of a common practice is limited for two reasons. First, under *Dukes*, for anecdotal evidence to give rise to an inference of a common practice, the evidence should be representative in number and in geography. *See* 131 S. Ct. at 2556. There, the Court found that the 120 affidavits reporting experiences of discrimination were "too weak to raise any inference that all the individual discretionary personnel decisions are discriminatory," given that the affidavits represented only 1 account for every 12,500 class members, related to only some 235 out of Wal-Mart's 3,400 stores, and primarily concentrated in only six states. *Id.*  Thus, the Court concluded that "[e]ven if every single one of these accounts is true, that would not demonstrate that the entire company operates under a general policy of discrimination." *Id.* (internal quotation and alteration omitted). In this case, even if we assume that the declarations are reliable, Plaintiff has not shown approximately how many Class Members there are, making it difficult for us to gauge how representative the 12 declarations are by number.[8]  Moreover, all 12 declarations are submitted by former SMs who worked at Defendant's Southern California stores. Thus, as in *Dukes*, even if we

---

[7] In other words, inasmuch as certain "common proof" can offer information about how long a SM spent on nonexempt tasks, it offers only piecemeal information on certain nonexempt tasks. Thus, whether the SMs spent any additional time on nonexempt tasks outside of the periods indicated in the records cannot be resolved on a classwide basis through the purported "common proof." This conclusion is further supported by evidence showing that the duties SMs perform and the amount of time they spend performing them depends on a wide variety of factors. (Opp'n 5). For instance, some SMs operate training stores, have district-wide duties, or manage more than one store at a time, and these different responsibilities impact how a SM allocates his or her time on various responsibilities. (*See, e.g.*, Triffo Dep. 166:25-167:4 (acknowledging that the amount of time on special projects depends on the District Manager and varies from district to district); Baca Dep. 72:11-23 (acknowledging that she had, at one point, spent a month at another store to help them manage inventory while managing her own store)). Together, the evidence suggests that whether a SM spent more than 50 percent of his or her time on nonexempt tasks depends on a variety of factors that cannot be captured by Plaintiff's "common proof." As a result, the purported "common proof" alone cannot establish whether Defendant had a common practice of violating the "primarily engaged" requirement.

[8] Plaintiff initially asserts that there are approximately 550 current and former SMs, based on Defendant's assertion in the Notice of Removal. Defendant, however, notes in its Opposition that this figure was based on Plaintiff's initial class definition that included "all salaried Managers," not just SMs. In response, Plaintiff asserts only that the class includes at least 125 members, given that Defendant operates 125 stores in California.

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 11-298-GHK (DTBx) | Date | January 28, 2013 |
|---|---|---|---|

| Title | *Jeannette Pedroza v. PetSmart, Inc. et al.* |
|---|---|

accept every single declaration as true, they do not give rise to the inference that this practice applies throughout California.  Second, subsequent deposition testimony given by some of the declarants casts doubt over the accuracy of their conclusory statements that they spent over 50% of their time on nonexempt tasks.  (*See, e.g.*, *Baca Dep.*, 218:13-220:5 (acknowledging that from the middle of 2008 to when she left in November 2008, she spent more than half of her time performing managerial tasks); Cerrillo Dep. 166:16-167:2 (acknowledging that he spent "most of the time running [his] store" as Store Manager)).  Given these and other inaccuracies in the declarations, as highlighted by the declarants' deposition testimony,[9] we decline to accord these conclusory statements substantial weight.  Thus, we conclude the declarations at most give rise to a weak inference of a common practice, if at all.

The allegation of a uniform training program likewise has only limited value in establishing a common practice.  First, even if we assume that the training program was uniformly administered, it does not tell us how SMs allocated their time between exempt and nonexempt time as a class.  *See, e.g., Cruz v. Dollar Tree Stores, Inc.*, 2011 WL 2682967, at *8 (N.D. Cal. July 8, 2011) (finding evidence of "centralized and human resources hierarchy" and use of "uniform training and training-related materials," "same on-the-job tools," "daily planners that require them to perform certain tasks," do not provide common proof that employees "were spending more than fifty percent of their time performing exempt tasks."); *Weigele v. FedEx Ground Package Sys, Inc.*, 267 F.R.D. 614, 622 (S.D. Cal. 2010) (finding training materials that provide instructions regarding the tasks the employees would perform to "provide no help to the Court in determining the actual work mix performed by the Plaintiffs").  Second, like the declarations, the allegation of a uniform training program suffers from similar reliability defects.  As Defendant points out, when questioned at deposition, at least one SM who attended the GetSmart training acknowledged that contrary to the statement in his declaration that he observed the GetSmart trainer spending more than 50 percent of his or her time on nonexempt duties, he only observed his trainer for 6 hours and does not know what the trainer did outside of those 6 hours.  (Zullo Dep. 192:23-193:20).  This acknowledgment undermines Plaintiff's assertion that the training program is a method by which Defendant propagates its common practice of requiring SMs to spend more than 50 percent of their time on nonexempt tasks.  Moreover, not all SMs attended the GetSmart training, (*see, e.g.*, Baca Dep. 65:14-21; Abeldt Dep. 68:19-69:7), which undermines Plaintiff's assertion that the training is uniformly administered.  In sum, we find that the allegation of a uniform training program gives rise to an even weaker inference of a common policy or practice than the declarations.

Overall, we find and conclude that the declarations, purported uniform training program, and other purported "common proof" do not constitute "significant proof" that Defendant had a policy or practice of requiring its SMs to spend more than 50 percent of their time on nonexempt tasks.  The purported "common proof" cannot even tell us how each SM allocated his or her time, much less tell us how the SMs as a class allocated their time.

In the absence of specific proof of a common practice, Plaintiff resorts to three general arguments in support of commonality.  First, Plaintiff argues that by subjecting all SMs to the executive

---

[9] See footnote 4.

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 11-298-GHK (DTBx) | Date | January 28, 2013 |
|---|---|---|---|

| Title | *Jeannette Pedroza v. PetSmart, Inc. et al.* |
|---|---|

exemption and classifying all SMs as overtime exempt, Defendant cannot "have its cake and eat it too" by arguing now that the SMs cannot form a cohesive group.  (Mot. 8).  Plaintiff argues that such uniform treatment of SMs on Defendant's part gives rise to both commonality and predominance.  However, as the Ninth Circuit noted in *In re Wells Fargo Home Mortg, Overtime Pay Litig.*, 571 F.3d 953, 955 (9th Cir. 2009), a "blanket exemption policy," unlike a centralized policy that details the job duties and responsibilities of employee, "does nothing to facilitate common proof on the otherwise individualized issues."[10]  *Id.* at 959.  "Whether such a policy is in place or not, courts must still ask [how] the individual employees actually spent their time" in determining whether the employees are misclassified as exempt.  *Id.*  Thus, it has no direct bearing on how an employer actually requires its employees to spend their time in practice.  If anything, the blanket exemption policy tends to show that there is an official policy requiring employees to spend more than 51 percent of their time on exempt tasks, and it is up to Plaintiff to establish otherwise for the purposes of class certification if she alleges that in practice, Defendant required SMs to spend more than 50 percent of their time on nonexempt tasks.

Second, Plaintiff relies on three pre-*Dukes* and pre-*In re Wells Fargo* cases to support her argument that she has sufficiently established commonality and predominance: *Tierno v. Rite Aid Corp.*, 2006 WL 2535056 (N.D. Cal. Aug. 31, 2006); *Alba v. Papa John's USA, Inc.*, 2007 WL 953849 (C.D. Cal. Feb. 7, 2007); *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152 (S.D.N.Y. 2008).  However, these cases have limited persuasive value because they relied significantly on the theory that an employer's blanket classification of plaintiffs as exempt is a strong factor in favor of certification, a premise which has since been rejected by *In re Wells Fargo*.  *See Alba*, 2007 WL 953849, at *1; *Tierno*, 2006 WL 2535056, at *10; *Damassia*, 250 F.R.D. at 156.  But more importantly, in all three cases, the plaintiffs sufficiently established that the company policies at issue tightly controlled the universe of duties performed by the employees.  *See Alba*, 2007 WL 953849, at *12 ("By delineating tasks that each store manager was to perform daily, the policies act as an indicator of how much time store managers had to spend on performing both exempt and non-exempt type work."); *Tierno*, 2006 WL 2535056, at *8 (concluding that certification was appropriate when an audit shows that each employee divided his or her time among 16 specified tasks, that defendant "implicitly concede[d] that a single set of tasks [was] applicable to all Store Managers"); *Damassia*, 250 F.R.D. at 156, 159 (concluding that certification is appropriate where defendant "conceded that the business practices at issue in this case are uniform among its stores").  In this case, Plaintiff has not similarly established that Defendant prescribed a single

_____

[10] *In re Wells Fargo*, a pre-*Dukes* case, analyzed the relevance of a blanket exemption policy to the predominance analysis.  *See* 571 F.3d 955.  It held that "[w]hile [an employer's] uniform exemption policies are relevant to the Rule 23(b)(3) analysis, . . . it is an abuse of discretion to rely on such policies to the near exclusion of other relevant factors touching on predominance."  *Id.*  However, to the extent it notes that a blanket exemption policy has no direct bearing on how employees actually spend their time and therefore does not speak to whether an employer has the practice of requiring its exempt employees to spend the majority of their time on nonexempt tasks, it is equally relevant to the post-*Dukes* commonality inquiry.

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 11-298-GHK (DTBx) | Date | January 28, 2013 |
|---|---|---|---|
| Title | *Jeannette Pedroza v. PetSmart, Inc. et al.* | | |

set of tasks to be performed by all SMs that could act as an indicator of how much time they had to spend on various duties.

Finally,  Plaintiff relies on *Sav-on Drug Stores, Inc. v. Superior Court*, 34 Cal. 4th 319 (2004) for the proposition that the "primarily engaged" requirement is subject to class resolution because the predominant issue is "how the various tasks . . . should be classified – as exempt or nonexempt," which can be determined as a matter of law by the trial court on a class-wide basis.  As the discussion above should make clear, however, the classification of various tasks is at most a helpful preliminary inquiry that aids in the resolution of the principal commonality inquiry – whether Defendant had a common practice of requiring SMs to spend more than 50 percent of their time on nonexempt tasks.[11]  Even if we resolve the issue of how various tasks should be classified, it leaves the key inquiry that underpins Defendant's liability unanswered, such that there may still be "[d]issimilarities within the proposed class" that "impede the generation of common answers."  *Dukes*, 131 S. Ct. at 2551.  Thus, under *Dukes*, the classification of tasks cannot "resolve an issue that is *central* to the validity of each of [Plaintiff's] claims in one stroke."  *Dukes*, 131 S. Ct. at 2551 (emphasis added).  Accordingly, the classification of tasks as exempt or nonexempt cannot give rise to sufficient commonality.

In sum, we find and conclude that Plaintiff has failed to offer "significant proof" that the SMs were subjected to a common policy or practice requiring them to spend more than 50 percent of their time on nonexempt tasks.  Accordingly, Plaintiff fails to establish commonality as to the "primarily engaged" requirement.

### b.    Predominance

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).  Assuming that the dissimilarities among the class members do not impede the generation of common answers, the post-*Dukes* predominance inquiry requires us to consider whether other issues unique to individual class members are likely to render adjudication by representation impractical.  The predominance standard is "far more demanding" than the commonality requirement of Rule 23(a).  *Id.*  The inquiry may require us to make "more precise factual determinations" and to formulate "some prediction as to how specific issues will play out in order to determine whether common or individual

---

[11] Based on the theory that the main issue in this case is how to categorize various tasks as exempt versus nonexempt, Plaintiff proposes a two-part trial plan.  In phase one of the trial plan, we can decide, on a class-wide basis, whether the duties performed by the SMs should be classified as exempt versus nonexempt.  Then, in phase two, we can rely on the survey developed by Plaintiff's expert, David Friedland, to determine, based on a purportedly representational sample of SMs, the percentage of time the SMs spent on nonexempt tasks.  As discussed above, however, Friedland's speculative declaration is inadmissible under *Daubert*.  Moreover, even if we assume that it is admissible, we are unpersuaded that the survey will produce reliable data under the "rigorous analysis" standard, given that the declaration includes no specific information about the survey's methodology.

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 11-298-GHK (DTBx) | Date | January 28, 2013 |
|----------|--------------------------|------|------------------|

| Title | *Jeannette Pedroza v. PetSmart, Inc. et al.* |
|-------|----------------------------------------------|

issues predominate in a given case." *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 593, *reversed on other grounds by Dukes*, 131 S. Ct. 2541 (internal quotation marks and citation omitted).

Here, as discussed above, Plaintiff has failed to establish that Class Members were subject to a common practice. Thus, we need not, and cannot, reach whether other issues predominate over the common question.

> **2.    Whether the SMs "Customarily and Regularly Exercised Discretion and Independent Judgment"**
>
> **a.    Commonality**

Under the "customarily and regularly exercise discretion" requirement of executive exemption, exempt employees must be "regularly called upon to exercise [their] discretion and judgment on matters of consequence." *In re United Parcel Service Wage and Hour Cases*, 190 Cal. App. 4th 1001, 1024 (Ct. App. 2010). "The phrase 'customarily and regularly' signifies a frequency which must be greater than occasional but which, of course, may be less than constant." *Id.* (quoting 29 C.F.R. § 541.207(g)). The requirement that discretion be exercised with respect to matters of consequence "means the decision being made must be relevant to something consequential and not merely trivial." *Id.*

Here, Plaintiff alleges that Defendant, through manuals and other corporate directives, tightly controls SMs such that they are stripped of nearly all discretion over their work functions. "SMs are directed by the home office regarding the smallest of details, such as how to store and maintain digital cameras and printers, how to maintain shopping carts, how to maintain trash cans, how store managers conduct meetings, how to review monthly profit and loss reports, how to review supplies, how to reward associates for great customer service, how to resolve customer service issues, how to operate a cash register, how to process loads, and how to remove chewing gum from the sidewalk." (Mot. 6-7). Moreover, Plaintiff alleges that the few decisions not mandated by Defendant's manuals and corporate directives are vested in the District Manager, who regularly visits the stores to ensure uniformity. (Mot. 7). "Although [SMs] were in charge of scheduling, they did so within the strict constraints of mandatory store hours, a limited payroll budget, and a prohibition on overtime work by hourly employees." (*Id.*). In essence, Plaintiff asserts that Defendant, through various corporate manuals and policies, has a policy or practice of "stripping SMs of nearly all discretion" on matters of consequence. (Mot. 6).

We find, however, that Plaintiff fails to offer "significant proof" that Defendant subjected Class Members to such a policy. As a preliminary matter, Plaintiff's emphasis that Defendant required SMs to engage in numerous duties "that [were] simply mundane tasks that [were] accomplished according to carefully controlled processes dictated by [Defendant's] corporate directives," (Reply 7), misses the mark. Constraint over "mundane" or "trivial" matters is irrelevant to whether a manger "customarily and regularly exercises discretion." "Supervisors and managers are not rendered mere automatons because they must navigate each workday mindful of regulations and internal policies governing their work environment and the employees they oversee." *In re United Parcel Service*, 190 Cal. App. 4th at

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 11-298-GHK (DTBx) | Date | January 28, 2013 |
|---|---|---|---|

| Title | *Jeannette Pedroza v. PetSmart, Inc. et al.* |
|---|---|

1026.  Instead, the relevant inquiry is whether Plaintiff has offered "significant proof" that Defendant had a common practice of stripping the SMs' discretion regarding *matters of consequence*.

In this case, an examination of the relevant manuals and policies shows that, on their face, they do not appear to strip SMs of all or nearly all discretion; instead, they implicitly or expressly require SMs to exercise their discretion on matters that could be considered consequential.  The Store Schedule Policy, for instance, specifies when, where, and how long the schedule should be posted, but it does not dictate how SMs should distribute the shifts among the employees.  (Mot, Exh. G at 37).  That SMs must exercise their discretion within certain parameters does not mean that they are stripped of all or nearly all discretion, as "Courts have recognized that modern companies often implement policies aimed at standardizing procedures and services, but the exercise of discretion 'even where circumscribed by prior instruction' is still required and critical to the success of the enterprise." *Tetsuo Akaosugi v. Benihana Nat'l Corp.*, 2012 WL 3999855, at *5 (N.D. Cal. Sept. 7, 2012) (quoting *Donovan v. Burger King Corp.*, 675 F.2d 516, 521-22 (2d Cir. 1982)).  The Store Communication Tools Procedure likewise specifies only the materials that the SMs need to bring to the meeting, the timing of the meeting, and the requirement that SMs should collect feedback and email the District Manager with any questions.  (Mot. Exh. G at 31).  It appears to leave room for the SMs to decide how exactly to conduct the meeting, what to say at the meeting, and what to do about any feedback the SMs receive.  Moreover, while the Associate Recognition Procedure specifies the "five behaviors" that SMs should recognize and reinforce in its associates, it expressly requires SMs to "use good judgment in determining whether the associate's behavior merits more than a Reward Card."  (Mot. Exh. G at 44).[12]  Thus, because these manuals and directives appear to require SMs to exercise their discretion on at least some matters of consequence, they do not constitute "significant proof" that the SMs, as a class, do not customarily and regularly exercise their discretion on matters of consequence.  Put another way, absent manuals that appear to strictly dictate the SMs' performance and evidence that SMs complied with any such manuals, we cannot determine how often the SMs exercise their discretion on matters of consequence on a classwide basis.

Moreover, Plaintiff's assertion that the manuals strip them of all or nearly all discretion is further undermined by evidence showing that the SMs are evaluated based on their overall ability to exercise good discretion and judgment in managing their stores.  In particular, SMs are evaluated based on several "success" factors, including their ability to understand "vision & strategy," "develop talent," "lead the culture," "manage personal insight & growth," "think critically," and "exercise good judgment."  (Exh 2 to Holloman Dep., "Field Performance Review Form, Section B").  Plaintiff herself acknowledged that these were the factors by which she was evaluated, (Pedroza Dep. 296:21-25), and agreed that in order to be a successful SM, she "had to be able to lead [her] team in a way that they were comfortable with and felt respected."  (Pedroza Dep. 308:5-9).  These evaluation criteria tend to show

---

[12] The manuals also leave room for the SMs to determine, *inter alia*, how much to discount a damaged product, (Mot. Ex. G, at 4), how to deal with protestors, (*id.* at 30), and how to resolve customer complaints, (*id.* at 47).

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 11-298-GHK (DTBx) | Date | January 28, 2013 |
|---|---|---|---|
| Title | *Jeannette Pedroza v. PetSmart, Inc. et al.* | | |

that the SMs were called upon to exercise their discretion on matters of consequence, and we have no
means of determining whether they did so "customarily or regularly" on a classwide basis.

Finally, to the extent that Plaintiff relies on the declarations of former SMs to establish the
existence of a discretion-stripping policy, the declarations fail as "significant proof" because they are
insufficiently representative, as discussed above.  Moreover, their reliability is further diminished by the
declarants' acknowledgment that they were required to exercise their discretion and judgment as SMs;
some even acknowledged they did so on a daily basis.  (*See, e.g.*, Cerrillo Dep. 87:3-90:15
(acknowledging use of discretion to reward hourly associates and resolve customer complaint, and
acknowledging that he tried to exercise good judgment "each day."); Baca Dep. 114:5 -13
(acknowledging that she exercised her judgment on a regular basis); Kowalow Dep. 109:6-10
(acknowledging that it was her job as "the leader of Store 140" to "think critically and use good
judgment every day")).  The SMs' testimony shows that even if the manuals and policies impose certain
restrictions on the SMs, their application, in practice, left room for the SMs to exercise their discretion
on matters of consequence.  Thus, whether Class Members in fact exercise their discretion "customarily
and regularly" cannot be resolved on a classwide basis in one stroke.

As with the "primarily engaged" requirement, Plaintiff argues that Defendant's internal policy
classifying all SMs as overtime exempt gives rise to both commonality and predominance.  As discussed
above, however, this internal policy has no direct bearing on how SMs actually perform their work
functions.  Thus, unlike the work manuals and policies we reviewed above, the blanket exemption
policy tells us little about whether Defendant has a common policy of stripping SMs of all or nearly all
of their discretion on matters of consequence.

We find and conclude that Plaintiff has failed to offer "significant proof" that Defendant has a
common policy or practice of leaving SMs with little discretion in how to manage their stores.
Accordingly, Plaintiff has failed to satisfy her burden in establishing commonality.

### b.      Predominance

Because we conclude that Plaintiff has failed to establish commonality, we need not, and cannot,
reach the question of whether common questions predominate over other potentially individualized
issues.

### 3.      Whether Plaintiff's PAGA Claim Can Proceed on a Representational Basis Without Class Certification

Plaintiff argues that her eleventh cause of action, a representative action for civil penalties under
the California Private Attorneys General Act of 2004 ("PAGA"), need not be certified under Rule 23
after the California Supreme Court's decision in *Aria v. Superior Court*, 46 Cal. 4th 969, 980 (2009),
which provides that a representative action under PAGA need not satisfy *state* class action requirements.
Thus, even if we deny class certification as to the other claims, Plaintiff argues that she can still proceed
on a representational basis as to her PAGA claim.  (Mot. 25).

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 11-298-GHK (DTBx) | Date | January 28, 2013 |
|---|---|---|---|

| Title | *Jeannette Pedroza v. PetSmart, Inc. et al.* |
|---|---|

     Under PAGA, an "aggrieved employee" may bring a civil action against an employer "on behalf of himself or herself and other current or former employees."  Cal. Lab. Code. § 2699(a).  If the employee's claim is successful, 75 percent of the penalties recovered is distributed to the Labor and Workforce Development Agency ("LWDA") while the remaining 25 percent is distributed to the aggrieved employees.  *Id.* § 2699(i).

     In *Aria*, the California Supreme Court clarified that a representative action under PAGA need not satisfy class action requirements under state law.  46 Cal. 4th at 980-88.  The Court reasoned that due process does not require class certification since the plaintiff employee brings a PAGA claim "as the proxy or agent of the state's law labor enforcement agencies."  *Id.* at 986.  Because the PAGA plaintiff is the proxy of the state, nonparty aggrieved employees and the agency are bound by any judgment as to the PAGA civil penalties as though the agency had brought the action.  *Id.*  Thus, a PAGA action is "fundamentally a law enforcement action designed to protect the public and not to benefit private parties."  *Id.* (citation omitted).  In fact, even if a PAGA plaintiff prevails by proving that an employer has committed a Labor Code violation, nonparty employees may still sue the employer "to obtain remedies other than civil penalties for the same Labor Code violations."  *Id.* at 987.  Such individual remedies may include lost wages and work benefits, *id.*, as well as statutory penalties, *see Hernandez v. Towne Park, Ltd.*, 2012 WL 2373372, at *17 (C.D. Cal. June 22, 2012) (Morrow, J.) ("PAGA is not designed to limit or proscribe remedies available to a plaintiff under preexisting law.  Before PAGA was enacted, many Labor Code provisions imposed statutory penalties recoverable by employees. These penalties are distinguishable from the *civil* penalties that a representative plaintiff can now seek under PAGA."); *Villacres v. ABM Industries Inc.*, 189 Cal. App. 4th 562, 579 (Ct. App. 2010) ("The PAGA is limited to the recovery of *civil* penalties.  Some Labor Code provisions establish penalties that are not expressly denominated 'civil penalties' and are therefore not subject to the PAGA," such as the waiting time penalty under Cal. Labor Code § 203).

     On the same day that it handed down its decision in *Aria*, the California Supreme Court also decided *Amalgamated Transit Union, Local 1756, AFL-CIO v. Superior Court*, 46 Cal. 4th 993, 1003 (2009), in which it found that PAGA "does not create property rights or any other substantive rights. Nor does it impose any legal obligations.  It is simply a *procedural statute* allowing an aggrieved employee to recover civil penalties – for Labor Code violations – that otherwise would be sought by state labor law enforcement agencies."  (emphasis added).  In *Amalgamated*, the Court held that "aggrieved employees" could not assign their right to sue under PAGA to the unions because PAGA, as a procedural statute, does not create a transferrable right akin to property right.  *Id.*

     In the wake of *Aria* and *Amalgamated*, district courts in this circuit are split over whether a representative PAGA claim must comply with Rule 23's class action requirements.  *Compare Ochoa-Hernandez v. Cjaders Foods, Inc.*, 2010 WL 1340777, at *4 (N.D. Cal. Apr. 2, 2010) ("Unlike class actions, these civil penalties are not meant to compensate unnamed employees because the action is fundamentally a law enforcement action."); *Moua v. Int'l Bus. Mach. Corp.*, 2012 WL 370570, at *3 (N.D. Cal. Jan. 31, 2012) ("PAGA transcends the definition of what is simply procedural. The statute's plain purpose is to protect the public interest through a unique private enforcement process, not to allow a collection of individual plaintiffs to sue the same defendant in one consolidated action for the sake of

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 11-298-GHK (DTBx) | Date | January 28, 2013 |
|---|---|---|---|
| Title | *Jeannette Pedroza v. PetSmart, Inc. et al.* | | |

convenience and efficiency."); *Mendez v. Tween Brands, Inc.*, 2010 WL 2650571, at *4 (E.D. Cal. July 1, 2010) ("The remedy sought in a PAGA suit consists of civil penalties, not individual or class damages. A PAGA action is fundamentally a law enforcement action designed to protect the public and penalize the employer for past illegal conduct. Restitution is not the primary object of a PAGA action, as it is in most class actions." (internal citations omitted)), *with Fields v. QSP, Inc.*, 2012 WL 2049528, at *5 (C.D. Cal. June 4, 2012) (concluding that because PAGA is a "procedural mechanism by which litigants may recover for absent plaintiffs, akin to a class action," the plaintiff "must meet the requirements of Rule 23 to proceed with her PAGA claim"); *Ivery v. Apogen Techs., Inc.*, 2011 WL 3515936, at *3 (S.D. Cal. Aug. 8, 2011) (concluding that PAGA "contravenes federal procedural requirements" and thus a PAGA litigant in federal court must comply with Rule 23); *Thompson v. APM Terminals Pac. Ltd.*, 2010 WL 6309364, at *2 (N.D. Cal. Aug. 26, 2010) ("To the extent Plaintiff here seeks to bring a representative PAGA action on behalf of other non-party, unnamed aggrieved employees in federal court, such a claim must meet the requirements of Rule 23.").

Having reviewed the relevant authorities, we agree with the view that PAGA claims need not comply with Rule 23 requirements to proceed on a representational basis. Inasmuch as *Aria* has concluded that "the [PAGA] employee plaintiff represents the same legal right and interest as state labor law enforcement agencies – namely, recovery of civil penalties that otherwise would have been assessed and collected by the Labor Workforce Development Agency," a PAGA action is fundamentally different in kind from a class action. As the Supreme Court aptly summarized in *Deposit Guaranty N.A. v. Roper*, 445 U.S. 326, 339 (1980), class action is principally designed to enable recovery for *individual injuries*:

> The aggregation of individual claims in the context of a class-wide suit is an evolutionary response to the existence of injuries unremedied by the regulatory action of government. Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device.

A Rule 23(b)(3) class, in particular, "added to the complex-litigation arsenal class actions for damages designed to secure judgments binding all class members save those who affirmatively elected to be excluded." *Amchem Prod.*, 521 U.S. at 614-15. This type of class action is meant to cover cases "in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Id.* (internal quotation and alteration removed). Further, because the named plaintiff in a class action seeks to represent the absent class members to recover individual relief on their behalf, due process requires the court to provide to class members "the best notice practicable under the circumstances." *Id.* at 617.

PAGA plaintiffs, on the other hand, do not seek to represent absent class members to recover individual relief on their behalf. Instead, they act "as the proxy or agent of the state's labor law enforcement agencies" to obtain civil penalties. *Aria*, 46 Cal. 4th at 986. As such, it is "fundamentally a law enforcement action designed to protect the public and not to benefit private parties." *Id.* Further,

E-Filed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 11-298-GHK (DTBx) | Date | January 28, 2013 |
|---|---|---|---|

| Title | *Jeannette Pedroza v. PetSmart, Inc. et al.* |
|---|---|

as a PAGA action does not limit "an employee's right to pursue or recover other remedies available under state or federal law, either separately or concurrently with [a PAGA] action," Cal. Labor Code § 2699(g)(1), it does not require PAGA plaintiffs to give notice to other "aggrieved employees."

Thus, we conclude that PAGA actions, as a law enforcement action seeking to protect the public against Labor Code violations by assessing penalties against violating employers,[13] serve a fundamentally different purpose from class actions, which allows a named plaintiff to represent class members to recover individual relief on their behalf for the sake of efficiency and practicality. In light of their distinct purposes, we conclude that PAGA claims need not be certified under Rule 23 to proceed on a representational basis because a PAGA claim is not a class action within the meaning of Rule 23.

**IV.     Conclusion**

Based on the foregoing, we conclude that Plaintiff has failed to satisfy her burden in establishing commonality as to her non-PAGA claims. Accordingly, Plaintiff's Motion for Class Certification as to her non-PAGA claims is **DENIED**. As to Plaintiff's PAGA claim, it may proceed on a representational basis without certification under Rule 23.

**IT IS SO ORDERED.**

--     :     --

Initials of Deputy Clerk                    Bea

---

[13] Inasmuch as *Amalgamated* characterized PAGA as "simply a procedural statute," we agree with the court in *Mendez* that this characterization should be confined to the holding of *Amalgamated*, which characterized PAGA as a procedural statute only to hold that it does not create a transferrable right like a property right. *See* 2010 WL 2650571, at *2. We conclude that *Amalgamated* does not stand for the broader proposition that PAGA is *purely* a procedural statute. "The bringing of a private claim under PAGA is a procedure, but one that serves the important function of protecting the 'public interest.' Such a statute is distinct in purpose and function from a purely procedural rule . . . ." *Id.* at 3.